UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

DAWN M. SCORDINO,

                               Plaintiff,

    -against-

NANCY A. BERRYHILL, Acting Commissioner
of Social Security.

                             Defendant.

-------------------------------------------------------------------x

**REPORT AND RECOMMENDATION**
17-cv-4620 (ADS)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Plaintiff Dawn M. Scordino ("Scordino" or "Plaintiff") seeks judicial review, pursuant to the Social Security Act, 42 U.S.C. § 405 *et seq.*, of the decision by the Defendant Nancy A. Berryhill,[1] the former Acting Commissioner of the Social Security Administration (the "Commissioner" or "Defendant"), denying her claim for Social Security Disability Insurance benefits. An Administrative Law Judge ("ALJ") concluded that Scordino is not disabled, and the Appeals Council denied Plaintiff's request for review. Presently before the Court, on referral from the Honorable Arthur D. Spatt for Report and Recommendation, is Scordino's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c). *See* Docket Entry ("DE") [12]. For the reasons set forth below, the Court respectfully recommends that Plaintiff's motion be granted in part and denied in part and that

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is hereby substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this action. *Dorta v. Saul*, No. 18-cv-00396, 2019 WL 3503961, at *1, n.1 (S.D.N.Y. Aug. 2, 2019) (citation omitted).

the case be remanded for further proceedings consistent with this Report and Recommendation.

## I. BACKGROUND

### A. Procedural History

On August 16, 2010, Plaintiff applied for Social Security Disability Insurance benefits under §§ 216(i) and 223(d) of the Social Security Act. *See* Administrative Transcript ("Tr."), DE [25], 45. Scordino, a former New York City police officer, alleged that she had been disabled since February 28, 2010. *See id.* at 52. Her alleged disabilities stem from an on-the-job car accident in 2002,[2] which necessitated a three-level spine fusion surgery in 2009. *See id.* at 23, 461; Plaintiff's Memorandum of Law in Support of Her Motion for Judgment on the Pleadings ("Pl. Memo"), DE [12-1], 4.

The Social Security Administration denied Plaintiff's application on December 17, 2010. *See* Tr.,111. Scordino then requested a hearing in front of an ALJ, which took place on July 19, 2012 before ALJ Hazel C. Strauss. *See id.* at 45-78, 111. On January 17, 2013, ALJ Strauss issued a decision denying Plaintiff's application. *See id.* at 108-25. Scordino requested a review of this decision by the Appeals Council, *see id.* at 199-200, and hearings before ALJ Patrick Kilgannon were held on February 20, 2015 and October 23, 2015.[3] *See id.* at 79-106, 896-919. ALJ Kilgannon denied Plaintiff's claim on January 15, 2016. *See id.* at 16-35. His decision became final on

---

[2] The accident occurred during a high-speed chase, when the driver lost control of the patrol car in which Plaintiff was a passenger, and she was struck on the passenger side. *See id.* at 590. After the accident, Scordino was taken to North Shore University Hospital, where she was evaluated and released. *See id.*

[3] The purpose of the October hearing was to obtain testimony from Dr. John Kwock regarding written interrogatories, dated May 12, 2015, as well as testimony from vocational expert, Dawn Blythe. *See id.* at 19.

June 5, 2017, when the Appeals Council denied Scordino's request for review. *See id.* at 1-6.

Plaintiff commenced the present action, seeking judicial review of ALJ Kilgannon's decision on August 7, 2017. *See* DE [1]. On February 26, 2018, Scordino moved for judgment on the pleadings. *See* DE [12]. On April 17, 2018, the Commissioner sought an extension of time to file a response, which Judge Spatt granted. *See* DE [14]; Electronic Order dated April 18, 2018. Defendant subsequently requested three additional extensions of time to file a response, which Judge Spatt granted. *See* DEs [15]-[17]; Electronic Orders dated May 21, 2018, July 17, 2018 and September 22, 2018. In granting the fourth request, Judge Spatt noted that the court would not accept any further extension requests. *See* Electronic Order dated September 22, 2018. Accordingly, when the Commissioner filed a fifth motion for an extension of time to file a reply, *see* DE [19], Judge Spatt denied the motion and deemed Plaintiff's motion for judgment on the pleadings "fully-briefed and unopposed." *See* DE [20]. Defendant then filed a motion for reconsideration of Judge Spatt's Order. *See* DE [21]. On March 25, 2019, Judge Spatt denied the Commissioner's motion for reconsideration and referred Plaintiff's motion for judgment on the pleadings to this Court for a Report and Recommendation. *See* DE [24]. Defendant filed the Administrative Transcript on August 6, 2019. *See* DE [25].

## B. **The Administrative Record**

Scordino was born on October 8, 1965 and lives with her fiancé and teenage son. *See* Tr., 47-49, 902-03. She has an associate degree in Business Management

and Accounting and worked briefly for an insurance agency before becoming a police officer in 1996. *See id.* at 52, 902-03. From 1996 to February 28, 2010, Plaintiff worked as a New York City police officer. *See id.* at 52-53.

After her work-related accident in 2002, Scordino began treatment with Jeffrey Shapiro, M.D. and James Kipnis, M.D. at Orthopedic Care of Long Island in 2006. *See id.* at 520-42. At her first visit, on July 17, 2006, Dr. Shapiro noted that Plaintiff had a "normal" gait and station and a cervical spine that appeared "[n]ormal to inspection," but had tenderness, muscle spasms and restricted flexion and extension, and he concluded that she had "clinical evidence of a cervical radiculopathy from pressure on a nerve root." *Id.* at 520-21. He instructed Plaintiff to take anti-inflammatory medication, suggested modified activity and explained the benefits of physical therapy, massage therapy and acupuncture. *See id.* at 521. At a consultation in June 2007, Dr. Shapiro noted that Scordino had a "complicated" medical history because a previous Magnetic Resonance Imaging ("MRI") had shown a disc herniation, while a recent one did not show a herniation, but showed "degenerative changes." *Id.* at 526. He also noted that while Plaintiff's Electromyograms ("EMG") had been abnormal in the past, recent EMGs were normal. *Id.* Dr. Shapiro prescribed Scordino Vicodin and referred her to manual therapy after finding that she appeared "very uncomfortable." *Id.* at 526-27. Plaintiff began physical therapy at Dr. Shapiro's office on December 5, 2007 and attended eight sessions in January 2008. *See id.* at 548. In February 2008, Plaintiff visited Dr. Shapiro for a new injury caused by slipping at a Stop and Shop. *See id.* at 531.

4

Scordino complained of lower back pain, which worsened with "prolonged activities such as sitting, standing, bending or lifting," as well as "left anterior knee pain, which is worse with kneeling and climbing stairs," decreased range of motion and swelling in her left wrist and weakness in grip strength in her left hand. *Id.* Dr. Shapiro diagnosed a lumber sprain and sprain of the knee and wrist and prescribed Vicodin. *See id.* at 532. In March 2008, Plaintiff informed Dr. Kipnis that her neck pain had worsened and that she was stiff and experienced difficulty turning, as well as "tingling in her left hand." *Id.* at 472. X-rays demonstrated "straightening of the cervical spine" and "diminished disc height," and Dr. Kipnis diagnosed Scordino with "cervical strain with cervical disc disease with cervical radiculopathy" and "possible disk herniation" and recommended physical therapy, massage and acupuncture. *Id.* Plaintiff received additional physical therapy from March to May. *See id.* at 548. In June 2008, Dr. Kipnis noted "restricted motion on left lateral bending as well as spasm and tenderness in the right trapezius," and in addition to recommending that Plaintiff continue with physical therapy, massage therapy and pain medication, gave her referrals for pain management and possible surgical intervention. *Id.* at 474.

In September 2008, Scordino began treatment with Jeff Silber, M.D., *see id.* at 501, who determined that she had disc herniation, "some anterior thecal sac compression and some cord compression." *Id.* at 592. In November, Dr. Silber referred Plaintiff to Thomas Jan, D.O., who noted "decreased range of motion in the cervical spine, primarily with flexion limited at 30 degrees with marked pain reproducing numbness in the bilateral hands . . ." *Id.* at 378. On December 5, 2008,

Dr. Jan performed nerve conduction and electromyographic studies, which revealed "bilateral mid-cervical posterior rami dysfunction." *Id.* at 490. On December 11, 2008, Dr. Silber noted that Plaintiff had "bilateral upper extremity symptoms for quite some time" and that she was "dropping objects" and "having problems with fine motor skills," and he advised her to consider surgery. *Id.* at 591. In January 2009, Dr. Silber reported that Plaintiff was "miserable with her bilateral arm pain and neck pain" and that she was weak in her arms and experienced numbness, tingling and "other signs of myelopathy," including dropping objects. *Id.* at 589. He further reported that two MRIs, taken on October 15, 2008 and October 23, 2008 showed that she had spinal cord compression at C6-C7, C4-C5 and C5-C6 due to herniated disks. *Id.* The following month, Scordino met again with Dr. Shapiro, who diagnosed Plaintiff with "[c]ervical disc herniations with radiculitis" and "[l]umbar sprain/strain," informed her that she would be an "excellent candidate" for surgery if her symptoms continued to worsen and prescribed her Vicodin and Skelaxin for pain. *Id.* at 476-77. From February 2009 to April 2009, Plaintiff had seven additional physical therapy sessions. *See id.* at 544.

On April 7, 2009, Dr. Silber performed a posterior cervical decompression laminectomy and fusion surgery on Plaintiff. *See id.* at 485-87. At her one-year follow-up appointment on April 26, 2010, Dr. Silber reported that the surgery had been "very successful" and that Scordino was "doing fantastic" and had no arm or neck pain, but was lacking about ten degrees of bilateral rotation in her neck and had

a "slightly decreased disc height below." *Id.* at 581.[4]  With respect to her job, he indicated that she was "restricted with light duty for now." *Id.*  Dr. Silber's notes from three follow-up appointments, on May 3, 2010, November 5, 2010 and May 26, 2011, indicate that "Maximum Medical Improvement" had not been reached. *See id.* at 575-80.  Two years post-surgery, Scordino complained of "severe neck pain . . . going [into] her head," but reported that her arm and leg symptoms were gone. *Id.* at 575.  Plaintiff continued to take Vicodin and Flexeril. *See id.*  An examination revealed that she had 5/5 motor strength, "good sensation," no swelling in her extremities, full range of motion of her shoulders and elbow, "normal" extension and rotation, no "altered lean or antalgic gait[,]" no "upper motor neuron findings" and "palpable trigger points in the suboccipital region bilaterally[.]" *Id.*

On December 2, 2011, Dr. Silber diagnosed "Cervical Spinal Stenosis" and continued Plaintiff's prescription of Vicodin and Flexeril, which he refilled again the following month. *See id.* at 640-42.  Subsequently, Scordino visited Dr. Kipnis on

---

[4] Dr. Silber had numerous follow-up appointments with Plaintiff. Approximately two weeks after the surgery, on April 23, 2009, Dr. Silber reported that Scordino's arm function had "returned significantly," and that while she still had "slight numbness in the tip of her thumb," her incisional pain was improving. *Id.* at 587.  The following month, on May 18, 2009, Dr. Silber reported that Plaintiff was "doing fantastic" and was "very happy thus far with her outcome." *Id.* at 586.  On June 29, 2009, Dr. Silber reported that the pain in Scordino's arms had "significantly improved," but that she still had neck stiffness and impaired cervical range of motion. *Id.* at 585.  On August 13, 2009, Dr. Silber reported that Plaintiff had "[n]o arm symptoms at all," but that her neck got tired by the end of the day, which "is expected," and concluded that she could return to work, but that she would need to continue wearing a collar. *Id.* at 584.  He further recommended that she start physical therapy. *Id.*  At her six-month follow up, on October 26, 2009, Dr. Silber noted that Plaintiff had not had any arm or neck pain until approximately a week prior, and that she believed she may have "slept wrong," which had resulted in "some right trapezial pain." *Id.* at 583.  He prescribed Flexeril and noted that if her condition did not improve within the following weeks, he would consider getting a new MRI. *Id.*  By January 25, 2010, nine months after her surgery, Dr. Silber reported that Plaintiff was "doing fantastic" and that the surgery had "helped her out tremendously." *Id.* at 582.  He noted that she was lacking about ten degrees of bilateral rotation, but had 5/5 motor strength, good sensation and an improved range of motion and that she had returned to work with "restricted duties." *Id.* at 582.

December 9, 2011 for "consistent" pain in her left ankle that had begun in July when she had tripped and twisted her ankle.  *Id.* at 633.  An MRI of her ankle taken on January 18, 2012 showed "peroneus brevis tendinosis without tear."  *Id.* at 637. Plaintiff returned to Dr. Kipnis for a follow-up on January 30, 2012, and in addition to reporting ankle pain, she complained of cervical spine pain and "weakness and limited mobility" of her neck.  *Id.* at 635.  On July 16, 2012, three years after Scordino's surgery, Dr. Silber reported that the surgery had "helped her out tremendously" and that she was "able to do all of her activities of daily living."  *Id.* at 644.  He further noted her reports that her arms and legs "feel great" and that she had no problems with fine motor skills but that she had occasional neck stiffness, pain and spasms.  *Id.* at 643.  Additionally, Dr. Silber continued Plaintiff's prescription of Flexeril and Vicodin and referred her to physical therapy.  *See id.* at 643-44.

Scordino began treatment with Brett Silverman, D.O. at Island Musculoskeletal Care on May 10, 2013.  *Id.* at 771.  At the first consultation, Plaintiff complained of cervical spine pain, pain and spasms in her neck and upper trapezius muscle and limited mobility.  *Id.*  Dr. Silverman's examination noted "no acute distress," a "fairly normal gait," "tenderness to palpation in the cervical paraspinal muscles," some spasms, "mild restricted range of motion" of right shoulder due to neck pain, but otherwise "good range of motion" of the elbows and wrists, 5/5 motor testing of the upper extremities, "[s]light decreased right biceps reflex compared to the left[,]" intact radial pulse, no atrophy or weakness of hand intrinsic muscles,

negative Hoffmann's reflex and positive trigger points in the bilateral upper trapezius muscle, which were greater on the right side than on the left.  *Id.*  Dr. Silverman referred Plaintiff to physical therapy and prescribed Flexeril, and he also advised Scordino to consider trigger point injections.  *See id.* at 772.  On May 14, 2013, Dr. Silverman performed electrodiagnostic studies, which revealed "evidence of bilateral mid-cervical radiculopathy without distal needle denervation" and "no evidence of peripheral neuropathy[.]" *Id.* at 767-70.  At a follow-up appointment on May 31, 2013, Dr. Silverman reiterated his observations from the May 10, 2013 consultation and additionally noted that Plaintiff would get trigger point injections but that she was deterring epidural shots.  *See id.* at 763.  He also prescribed Flexeril and referred Scordino to physical therapy.  *See id.*  Plaintiff attended physical therapy at Dr. Silverman's office on May 30 and 31 and multiples times a month from June to November 2013.  *See id.* at 706-07, 711-18, 724-31, 735-45, 750-51 752-61, 764-65. Additionally, from June to November, Dr. Silverman administered trigger point injections to Scordino's left and right upper trapezius muscles and upper cervical paraspinal muscles bilaterally, which Plaintiff reported to be helpful.[5]  *See id.* at 698-99, 703-05, 719-23, 732-33, 746-48.  At follow-up appointments in June and July, Dr. Silverman noted "ongoing complaints of neck pain and spasm," "guarding of her neck," "tenderness to palpation in the cervical paraspinal muscles," some spasms in the left and right upper trapezius muscles and cervical paraspinal muscles, but "fairly good range of motion," "normal gait," "no acute distress," negative Hoffmann's reflex,

---

[5] These shots were administered on the following dates:  June 25, 2013, July 30, 2013, September 13, 2013, October 25, 2013 and November 22, 2013.

intact radial pulses and "adequate" grip strength. *Id.* at 732, 746. In September, Dr. Silverman reiterated his impressions from the previous two appointments and further noted that Plaintiff had "myofascial pain and radiculopathy" and "[c]omplaints of left upper extremity weakness," but that her grip strength was now "good." *Id.* at 719. In October, Dr. Silverman reviewed an MRI taken on October 18, 2013, which revealed a C7-T1 left sided disc herniation and no spinal stenosis at Plaintiff's surgical site. *See id.* at 703, 708. Additionally, he reiterated his observations from previous appointments, but noted that Scordino's left hand now showed a "[m]ildly weakened" grip strength. *See id.* at 703.

In November 2013, Plaintiff began treatment with Peter Kechejian, M.D. *See id.* at 788-89. Dr. Kechejian noted that Scordino reported pain scores of 9/10 and a "poor quality of life." *Id.* at 788. He observed that Plaintiff "is suffering from chronic cervical fusion pain syndrome with elements of new cervical radiculopathy and myofascial pain in her neck and trapezius areas" and that she was "failing her current level of medical management[,]" "would benefit from interventional management" and was considering epidural steroid injection to treat spinal inflammation and "anti-neuropathic medications such as Neurontin." *Id.* at 789. Additionally, Dr. Kechejian encouraged Scordino to consult Dr. Silber regarding other surgical options if the injections and medications did not improve her condition. *Id.* On November 26, 2013, Dr. Kechejian administered the first cervical epidural, *see id.* at 797, and the following month Plaintiff reported an ongoing pain score of 7/10. *See id.* at 787.

Scordino continued treatment with Dr. Silverman through 2014 and with Dr. Kechejian through 2015. During this time, Dr. Silverman prescribed Neurontin and Flexeril[6] and Dr. Kechejian continued to administer cervical epidural shots and trigger point injections.[7]  On February 27, 2015, Plaintiff began treatment with Shuriz Hishmeh, M.D. *See id.* at 812-13. She reported to Dr. Hishmeh that her left arm and hand were "always very weak and numb" and that she experienced neck, shoulder and arm pain throughout the day (and rated this pain at 9/10). *Id.* at 823-25. Additionally, she noted that standing, walking, taking the stairs, bending, lifting and "general activity" worsened her pain and that she could walk, sit and stand for less than 15 minutes at a time. *Id.* at 825. Dr. Hishmeh diagnosed Plaintiff with "displacement of cervical intervertebral disc without myelopathy" and gave her a prescription for X-rays. *Id.* at 812-13. Cervical spine x-rays taken on March 6, 2015 showed "[p]ostoperative and degenerative changes . . . without evidence of instability upon flexion or extension." *Id.* at 818-19. Further, a cervical spine MRI taken on March 20, 2015 revealed "[s]light interval increase in degenerative changes at C3-4, where there is mild spinal canal stenosis[,]" and "[s]light interval decrease in C7-T1 disc herniation." *Id.* at 816-17. Dr. Hishmeh met with Plaintiff on March 9, 2015 and, after reviewing the x-rays and MRI, diagnosed her with "displacement of cervical

---

[6] Plaintiff visited Dr. Silverman on the following dates in 2014:  January 15, 2014, *see id.* at 692-93, March 11, 2014, *see id.* at 689-91, June 10, 2014, *see id.* at 680-81, 686-88, July 30, 2014, *see id.* at 684-85, October 8, 2014, *see id.* at 682-83 and December 5, 2014, *see id.* at 674-75.

[7] After the initial cervical epidural shot on November 26, 2013, Dr. Kechejian administered cervical epidural shots and trigger point injections on the following dates:  February 7, 2014, *see id.* at 785-86 (trigger point injection), February 25, 2014, *see id.* at 796 (cervical epidural shot), April 16, 2014, *see id.* at 783-84 (trigger point injection), May 6, 2014, *see id.* at 795 (cervical epidural shot), November 18, 2014, *see id.* at 794 (cervical epidural shot), February 24, 2015, *see id.* at 793 (cervical epidural shot).

intervertebral disc without myelopathy" and prescribed a "dedicated physical therapy and rehabilitation program." *Id.* at 814-15. Dr. Hishmeh further noted that he would evaluate the need for surgery after Scordino completed the physical therapy program. *See id.* at 814. At follow-up appointments on April 27, 2015 and July 27, 2015, Scordino complained of left arm/hand numbness and weakness (which sometimes resulted in dropping items) and discussed the possibility of surgery with Dr. Hishmeh, who noted that even with surgery, her condition "may be permanent." *Id.* at 866-69.

## II. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(c)

Pursuant to Fed. R. Civ. P. 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted only where "all material facts are undisputed and a judgment on the merits is possible merely by considering the contents of the pleadings." *Nathaniel v. City of N.Y.*, No. 16-cv-256, 2017 WL 3912986, at *1 (E.D.N.Y. Sept. 6, 2017) (internal quotation marks and citations omitted).

### B. Judicial Review of Commissioner's Determination

In reviewing the Commissioner's decision, a court first determines whether the decision was based on the correct legal standards and then assesses whether the Commissioner's conclusions were supported by substantial evidence. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citations omitted). If the Commissioner's

decision meets both requirements, the reviewing court must affirm, and if it does not, the court may modify or reverse the Commissioner's decision, with or without remanding the case. *See* 42 U.S.C. § 405(g*); Clyde v. Comm'r of Soc. Sec.*, No. 18-cv-6209, 2019 WL 4386032, at *4 (S.D.N.Y. Sept. 13, 2019). An ALJ's failure to apply the correct legal standard constitutes reversible error where that failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks and citation omitted). If the reviewing court finds that the ALJ applied the correct legal standards, it then conducts a "plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Martinez v. Comm'r of Soc. Sec.*, No. 18-cv-01570, 2019 WL 3852439, at *6 (S.D.N.Y. Aug. 16, 2019) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault*, 683 F.3d at 447-48 (internal quotation marks, citation and emphasis omitted). An ALJ's decision is supported by substantial evidence where it is "based on consideration of 'all evidence available in [the claimant]'s case record.'" *Martinez*, 2019 WL 3852439, at *7 (quoting 42 U.S.C. §§ 423(d)(5)(B), 1382 (a)(3)(H)(i)). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citation omitted). Thus, a district court may reject an ALJ's factual findings "only if a reasonable factfinder would *have to conclude otherwise.*" *Id.* (internal quotation marks and citations omitted) (emphasis in original). The court

may not, however, "affirm an administrative action on grounds different from those considered by the agency." *Geathers v. Saul*, No. 18-cv-2346, 2019 WL 3779520, at *8 (S.D.N.Y. Aug. 12, 2019*), report and recommendation adopted*, 2019 WL 4464210 (S.D.N.Y. Sept. 18, 2019) (quoting *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015)).

### C. <u>Commissioner's Determination of Disability</u>

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairments must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. §§ 423(d)(2)(A).

In determining whether a person is disabled, the Commissioner "'must make a thorough inquiry into the claimant's condition and must be mindful that the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Dorta*, 2019 WL 3503961, at *5 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)). When conducting this analysis, the Commissioner must consider: (1) the objective medical facts; (2) the diagnoses or medical opinions based on these facts; (3) the subjective evidence of pain and disability; and (4) the claimant's age, education and work experience. *Geathers*, 2019 WL 3779520, at *9 (citations omitted).

Specifically, the Commissioner is required to apply a five-step process promulgated by the Social Security Administration.  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).  Pursuant to this process, the Commissioner evaluates:

> (1)  whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity[8] assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Id.* (internal quotation marks and citations omitted).  The claimant has the burden of proving the first four steps, and then at the fifth step, the burden shifts to the Commissioner to prove that the claimant is capable of working.  *See id.* (citations omitted).

## III.  DISCUSSION

Plaintiff asks the Court to reverse ALJ Kilgannon's final decision or, in the alternative, to remand her case for a new hearing on the grounds that ALJ Kilgannon failed to:  (1) follow the "treating physician rule" by affording little weight to the opinions of Scordino's treating physician; and (2) properly evaluate Plaintiff's credibility.  *See* Pl. Memo, 20-28.

### A.  <u>ALJ Kilgannon Violated the Treating Physician Rule</u>

Under the treating physician rule, the opinion of a claimant's treating physician is given controlling weight if it is "well-supported by medically acceptable

---

[8] A claimant's residual functional capacity is "the most [she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (citation omitted); 20 C.F.R. § 404.1527(c)(2) (noting that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ."). A treating physician is defined as a claimant's "own physician, osteopath or psychologist (including an outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Coscia v. Astrue*, No. 08-cv-3042, 2010 WL 3924691, at *7 (E.D.N.Y. Sept. 29, 2010) (citing *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)).

Where a treating physician's opinion is not entitled to "controlling weight," it is still generally entitled to more weight than the opinion of a consultative physician, which, in turn, is entitled to more weight than the opinion of a non-examining physician. *Moscatello v. Saul*, No. 18-cv-1395, 2019 WL 4673432, at *12 (S.D.N.Y. Sept. 25, 2019); *see also Daniels on behalf of D.M.G. v. Comm'r of Soc. Sec.*, No. 17-cv-01768, 2018 WL 5019746, at *7 (S.D.N.Y. Sept. 30, 2018) (noting that the opinion of a consultative physician is generally entitled to "limited weight") (citation omitted); *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (noting that the opinions of medical advisors who have not personally examined a claimant "deserve little weight"

as their "assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant").  If an ALJ decides not to afford the treating physician's opinion controlling weight, he must determine how much weight, if any, to give it based on the factors set forth in 20 C.F.R. § 404.1527(c): "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)) (alteration omitted).  An ALJ's failure to "explicitly" apply these four factors is a procedural error.  *Id.* at 96 (internal quotation marks and citation omitted). Further, while there may be "genuine conflicts in the medical evidence for the ALJ to resolve," an ALJ may not "substitute [his] own judgment for that of a medical professional." *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) (Summary Order) (citation omitted).  Thus, if, after considering the above factors, an ALJ decides not to give the treating physician's opinion controlling weight, he must "comprehensively set forth his reasons for the weight assigned" to the physician's opinion. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (citation and alteration omitted); *see also* 20 C.F.R. § 404.1527 (c)(2) (stating that the agency "will always give good reasons" for the weight afforded to the treating physician's opinion).  Failure to do so is a basis for remand.  *Burgess*, 537 F.3d at 117 (citations omitted); *see also Gunter*, 361 F. App'x at 199 ("We do not hesitate to remand when the Commissioner

has not given good reasons for the weight given to a treating physician's opinion.") (citation omitted).

Here, four doctors—Robert Hecht, Jerome Caiati, Kanista Basnayake and John Kwock—provided medical assessments for the Social Security Administration. Of these doctors, only Dr. Hecht is Plaintiff's treating physician. Although, as discussed further below, he only examined Scordino on one occasion, Plaintiff was treated extensively at Island Musculoskeletal Care, with which Dr. Hecht was affiliated, which is sufficient to establish him as her treating physician. *See Clark v. Astrue*, No. 08-cv-10389, 2010 WL 3036489, at *3, n.3 (S.D.N.Y. Aug. 4, 2010) (citations omitted). Dr. Caiati and Dr. Basnayake are consultative physicians, who provided examinations at the request of the Social Security Administration, and whose reports indicate that they did not have a doctor-patient relationship with Scordino. *See* Tr., 507-10, 835-38. Finally, Dr. Kwock is a non-examining physician, who formed his opinion solely upon a review of Plaintiff's medical record. *See id.* at 83.

1. Treating Physician:  Robert Hecht, M.D.

On March 2, 2015, Dr. Hecht, of Island Musculoskeletal Care, provided a residual functional capacity assessment. *See id.* at 25. Dr. Hecht noted that Scordino had been a patient at Island Musculoskeletal Care since June 10, 2014.[9]  *Id.* at 810. His physical exam revealed "tenderness in the cervical spine," restricted flexion and extension, no spasm, normal lordosis, full active range of motion and 5/5 motor

---

[9] Plaintiff's primary doctor at Island Musculoskeletal Care was Dr. Silverman, and he first saw Scordino in 2013, not 2014.  *See id.* at 771.

strength in shoulders, elbows and wrists, intact sensation, and reflexes of "2+ and symmetric of bilateral triceps, biceps and wrists." *Id.* Dr. Hecht opined that Plaintiff's "complaints, findings on physical examination and findings on diagnostic testing are consistent[,]" that her ability to "lift, carry, sit, stand, walk, reach, handle, push, pull, climb, balance, stoop, kneel, balance [sic], crouch and crawl" is limited and that he expects her "disability to persist." *Id.* at 811.  Additionally, he completed a form entitled "Medical Source Statement of Ability to do Work-Related Activities (Physical)" ("MMS") in which he noted that Scordino could:  (1) occasionally[10] lift or carry up to ten pounds; (2) sit for less than one hour at a time, up to a total of four hours (out of an eight-hour work day); (3) stand and walk for less than one hour at a time, up to a total of one hour (out of an eight-hour work day); (4) frequently[11] use both hands for "handling," "fingering" and "feeling" and occasionally use them for reaching, pushing and pulling; (5) occasionally operate "foot controls" with both feet; (6) never climb stairs, ramps, ladders or scaffolds and never stoop, crouch or crawl; (7) occasionally balance and kneel; (8) perform activities like shopping, traveling without a companion for assistance, ambulate without using a wheelchair or crutches, use standard public transportation, "climb a few steps at a reasonable pace with the use of a single handrail," prepare a simple meal and feed herself and care for her personal hygiene, but could not "walk at a reasonable pace on rough or uneven surfaces." *Id.* at 804-08.

---

[10] Unless otherwise noted, "occasionally" is defined as "very little to one-third of the time." *Id.* at 804.

[11] Unless otherwise noted, "frequently" is defined as "one-third to two-thirds of the time." *Id.* at 804.

2.  <u>Consultative Physicians:  Jerome Caiati, M.D. and Kanista Basnayake, M.D.</u>

Dr. Caiati performed an internal medicine consultative examination on December 10, 2010 at the request of the Social Security Administration.  *See id.* at 24, 507.  Regarding Scordino's general appearance, Dr. Caiati noted that she appeared to be in "no acute distress," had a normal gait, could walk on heels and toes without difficulty, could squat fully but needed to hold the table to do so, had a normal stance, used no assistive devices, needed no help changing or getting on and off the table for the exam and could rise from her chair without difficulty.  *Id.* at 508.  His exam showed no scoliosis, kyphosis or abnormality in thoracic spine, full range of motion of shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally, "[n]o evident subluxations, contractures, ankylosis or thickening," stable and nontender joints, no redness, heat swelling or effusion, no sensory deficit, 5/5 strength in upper and lower extremities, "[n]o cyanosis, clubbing, or edema[,]" equal and physiologic pulses, "[n]o significant varicosities or trophic changes[,]" no muscle atrophy, intact hand and finger dexterity, 5/5 grip strength and 5/5 pinch of fingers to thumb bilaterally.  *Id.* at 508-09.  Dr. Caiati diagnosed Plaintiff with cervical fusion and lupus, as well as a history of right and left carpal tunnel release, anemia, Epstein-Barr viral syndrome, fatigue and thromboses.  *See id.* at 509.  He further noted that Scordino is "unrestricted" with respect to "[s]itting, standing, walking, reaching, pushing, pulling, bending, and climbing," but that cervical pain caused "minimal limitation" of her ability to lift.  *Id.* at 510.

Dr. Basnayake examined Plaintiff on April 22, 2015 at the request of the Social Security Administration. *See id.* at 25, 835. Her physical examination of Scordino showed "no acute distress," normal gait, ability to walk on heels and toes without difficulty, full squat, normal station, no need for assistive devices, no help needed to change or get on and off the exam table, ability to rise from chair without difficulty, intact hand and finger dexterity, 5/5 bilateral grip strength and ability to zip, button and tie. *Id.* at 836. Her examination of Plaintiff's cervical, thoracic and lumbar spine showed no spasms or trigger points, and the examination of her upper and lower extremities revealed full range of motion, no joint inflammation, effusion or instability, no muscle atrophy, no sensory abnormality and "physiologic and equal" reflexes. *Id.* at 836-37. Dr. Basnayake opined: "Due to poor vision, the claimant is restricted from activities requiring fine visual acuity. Due to neck pain, the claimant has moderate limitation for prolonged carrying, lifting, reaching, and holding. The claimant complains of fatigue due to anemia and lupus. The claimant has moderate limitation for prolonged standing, walking, and climbing." *Id.* at 837. Additionally, Dr. Basnayake completed an MMS,[12] where she opined that Plaintiff could: (1) never lift or carry any weight; (2) sit, stand and walk for 30 minutes at a time for a total of one hour (out of an eight-hour work day); (3) occasionally with her right hand and never with her left hand reach, handle, finger, feel, push or pull; (4) frequently operate "foot controls" with both feet; (5) never climb stairs, ramps, ladders or scaffolds and occasionally balance, stoop, kneel, crouch and crawl; (6) occasionally

---

[12] The Court notes the administrative error on this form, where the name of the patient is listed as "John Scordino." *Id.* at 828.

operate a motor vehicle; and (7) perform activities like shopping, traveling without a companion for assistance, ambulate without using a wheelchair or crutches, "walk at a reasonable pace on rough or uneven surfaces," "climb a few steps at a reasonable pace with the use of a single handrail," prepare a simple meal and feed herself, care for her personal hygiene and sort, handle or use paper/files, but could not use standard public transportation. *Id.* at 828-33.

3. <u>Non-examining Physician:  John Kwock, M.D.</u>

Dr. Kwock never examined Plaintiff, but instead based his opinion on a review of her medical records. *See id.* at 83.  Dr. Kwock concluded that Scordino could:  (1) continuously[13] lift and carry up to 20 pounds, frequently lift and carry up to 50 pounds, and occasionally lift and carry up to 100 pounds; (2) sit, stand and walk for up to six hours at a time for up to seven hours in a day (out of an eight-hour work day); (3) frequently reach overhead, push and pull with both hands and continuously reach in other directions, handle, finger and feel with both hands; (4) continuously operate "foot controls" with both feet; (5) continuously climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel and crouch, but never crawl; (6) frequently be exposed to "[u]nprotected heights" and operate moving mechanical parts and a motor vehicle; and (7) perform activities like shopping, traveling without a companion for assistance, ambulate without using a wheelchair or crutches, "walk at a reasonable pace on rough or uneven surfaces," use standard public transportation, "climb a few steps at a reasonable pace with the use of a single handrail," prepare a simple meal

---

[13] Unless otherwise noted, "continuously" is defined as "more than two-thirds of the time." *Id.* at 855.

and feed herself, care for her personal hygiene and sort, handle or use paper/files.  *Id.* at 855-60.  He concluded that Plaintiff had "mild impairment in cervical spine" range of motion and "mild impairment in upper extremity strength for pushing [and] lifting overhead."  *Id.* at 861.  On October 23, 2015, Dr. Kwock testified as a medical expert before ALJ Kilgannon.  *See id.* at 79-97.  Dr. Kwock testified that after reviewing Plaintiff's record for a second time, he had changed his opinion about how much she could lift and carry, now finding that she could lift and carry no more than ten pounds on a frequent basis and up to 20 pounds on an occasional basis and could never lift or carry more than 20 pounds, but his other conclusions regarding Scordino's abilities remained the same.  *See id.* at 83-84.

4. ALJ Kilgannon's Assessment

ALJ Kilgannon afforded "significant weight" to Dr. Caiati's opinion and "good weight" to the opinion of Dr. Kwock.  *See id.* at 26.  With respect to Plaintiff's treating physician, Dr. Hecht, ALJ Kilgannon afforded his opinion "little weight."  *See id.* at 24-26.[14]

ALJ Kilgannon explained that he afforded Dr. Caiati's opinion "significant weight" because "he has appropriate expertise and conducted a full examination of [Plaintiff], and the opinion is supported by his examination findings."  *Id.* at 25. Similarly, he found Dr. Kwock's opinion to merit "good weight" because "his conclusions are in accord with the medical evidence of record, most particularly the

---

[14] ALJ Kilgannon similarly afforded Dr. Basnayake's opinion "little weight," but because, as discussed above, Dr. Basnayake is not a treating physician, the Court need not analyze his reason for doing so.

lack of nerve root or cord involvement; the largely normal examination findings of record and the mostly 5/5 motor strength repeatedly exhibited in the upper extremities." *Id.* at 26. Regarding his decision to afford Dr. Hecht's opinion "little weight," ALJ Kilgannon explained that the record failed to establish "longitudinal care" and that Dr. Hecht's "lone treatment record does not support his opinion nor is it in accord with the medical evidence of record." *Id.* at 25.

ALJ Kilgannon's brief explanations fall short of his duty to provide "good reasons" for rejecting a treating physician's opinion. *See* 20 C.F.R. § 404.1527(d)(2). Initially, ALJ Kilgannon did not explain the ways in which Dr. Hecht's opinion was inconsistent with the record or provide a detailed explanation for his conclusion. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) (noting that it is not enough for the ALJ to simply say that a doctor's findings are inconsistent with the rest of the record, but rather he must "adequately provide[] reasons which explain" the purported inconsistencies). Further, in evaluating Dr. Hecht's opinion, ALJ Kilgannon did not appear to address the factors for determining the weight to give the non-controlling opinion of a treating physician set forth in 20 C.F.R. § 404.1527(c). Specifically, ALJ Kilgannon did not adequately assess the length and nature of Dr. Hecht's treatment. While, ALJ Kilgannon was correct in noting that Dr. Hecht only examined Plaintiff on one occasion—which, incidentally, he failed to mention was similarly true for Dr. Caiati—he did not recognize that Scordino had been a patient at Dr. Hecht's office, Island Musculoskeletal Care, under the care of Dr. Silverman since 2013. *See* Tr., 771. Nor did he explain why Dr. Hecht's opinion,

rendered in 2015, merited less weight than Dr. Caiati's opinion, which was rendered in 2010. Finally, ALJ Kilgannon failed to consider that Dr. Hecht is a specialist in pain medicine and rehabilitation, *see id.* at 809, and thus his opinion is entitled to greater weight than that of a non-specialist. *See* 20 C.F.R. § 404.1527(c)(5). Although contradictions between the doctors' opinions were for ALJ Kilgannon to resolve, his cursory explanation for discrediting Dr. Hecht's opinion indicates that he resolved the contradictions between his opinion and those of Dr. Caiati and Dr. Kwock arbitrarily. *See Gunter*, 361 F. App'x at 200 ("[W]hile contradictions in the medical record are for the ALJ to resolve . . . they cannot be resolved arbitrarily . . .") (citations omitted). Finally, ALJ Kilgannon's decision to afford "good weight" to Dr. Kwock was in direct contravention to the Social Security Administration's regulation that the opinion of an examining physician is entitled to greater weight than that of a non-examining physician. *See* 20 C.F.R. § 404.1527(c)(1); *see also Vargas*, 898 F.2d at 295-96.

Because ALJ Kilgannon failed to provide good reasons for rejecting Dr. Hecht's opinion and discounted his opinion without fully or accurately examining all the relevant factors set forth in 20 C.F.R. § 404.1527(c)(5), the Court respectfully recommends remand for further evidentiary proceedings. *See Selian*, 708 F.3d at 419 (failure to provide "good reasons" for not crediting treating physician's opinion "by itself warrants remand").

**B. <u>ALJ Kilgannon Failed to Properly Evaluate Scordino's Credibility</u>**

Scordino further contends that ALJ Kilgannon failed to properly evaluate her credibility pursuant to the framework set forth in the Social Security Act. *See* Pl. Memo, 28-30. In determining whether a claimant is disabled for purposes of the Social Security Act, the ALJ must consider the claimant's "relevant medical and other evidence," 20 C.F.R. § 416.945(a)(3), including her "reports of pain and other limitations." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929; *McLaughlin v. Sec'y of Health, Ed. & Welfare of U.S.*, 612 F.2d 701, 704-05 (2d Cir. 1980)). The ALJ may, however, "exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record" and is not required to accept the claimant's subjective reports "without question." *Id.* (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). Nonetheless, the Second Circuit has held that a claimant's subjective pain is an important factor to consider in assessing disability and that even if a "claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source." *Cabreja v. Colvin*, No. 14-cv-4658, 2015 WL 6503824, at *32 (S.D.N.Y. Oct. 27, 2015) (citations omitted); *see also Marcus*, 615 F.2d at 27.

To evaluate a claimant's subjective description of her pain, an ALJ engages in a two-step inquiry, considering first whether the claimant has a "medically determinable impairment that could reasonably be expected to produce the pain

alleged" and then evaluating the "intensity and persistence of those symptoms considering all of the available evidence." *Peck v. Astrue*, No. 07-cv-3762, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010) (citation and alteration omitted); *see also* 20 C.F.R. § 404.1529.   The second part of this inquiry involves two separate determinations regarding:   "(1) the amount of pain substantiated by the medical evidence, and (2) the claimant's credibility as to any additional complaints of pain." *Peck*, 2010 WL 3125950, at *5.  If the claimant's symptoms are not such that could be shown by objective medical evidence, the ALJ must assess the claimant's disability based on an evaluation of the entire record.  *Martinez v. Astrue*, No. 06-cv-3384, 2009 WL 2168732, at *16 (S.D.N.Y. July 16, 2009) (citation omitted).  In so doing, the ALJ is to consider:  (i) the claimant's daily activities; (ii) location, duration, frequency and intensity of claimant's pain; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness and side effects of medication claimant has taken to alleviate pain; (v) treatment, other than medication, claimant receives for pain relief; (vi) claimant's additional methods of relieving pain (such as lying flat on her back or standing for 15 minutes every hour); and (vii) other factors concerning claimant's functional limitations and restrictions due to pain.   *Id.* at n.27; 20 C.F.R. § 404.1529(c)(3).  Where an ALJ does not follow these steps, remand is appropriate. *Peck*, 2010 WL 3125950, at *4.  Further, notwithstanding the traditional deference given to ALJs with respect to evaluating credibility, *see Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 645 (S.D.N.Y. 2019), *appeal dismissed* (May 31, 2019) (citation omitted), where an ALJ rejects witness testimony as not credible, he must set forth

the basis for his finding "with sufficient specificity to permit intelligible plenary review of the record." *Daniels v. Berryhill*, 270 F. Supp. 3d 764, 775 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).

At the February 20, 2015 hearing before ALJ Kilgannon, Plaintiff testified that during the day she gets up to see her son off to school, and then "hang[s] around," watches TV, naps and "straighten[s] up a little bit." *See* Tr., 906. She stated that she cannot make her bed because she does not "have much mobility for stretching," has pain in her neck and shoulders and lacks the strength to pull the sheets over the mattress as a result of the pain medication that she takes. *Id.* When asked how much she could lift, Scordino testified that she can "hardly carry . . . a gallon of milk from here to there." *Id.* Plaintiff further testified that her fiancé does the grocery shopping and the majority of the housekeeping and cooking, but that she can "wipe the counter a little bit," sit down and fold laundry and "make something quick" like a Pop-Tart or an Eggo waffle but cannot stand for more than 20 minutes to prepare a meal. *Id.* at 906-07, 909. She explained that if she stands too long, she feels pain in her neck, shoulders and head and feels like she "can't hold up [her] head for long" because it feels like it "weighs too much for [her] neck to hold." *Id.* at 908. If she stands for too long, Plaintiff explained, she needs a neck brace to hold up her neck, and she often lays down every hour but is not always able to sleep because she "can't ever feel comfortable." *Id.* When asked how she feels when sitting down, Scordino testified that it is hard for her to sit still and she feels "[c]onstant throbbing and soreness like [she has] a pinched nerve all the time" and that she gets headaches and

28

it "very uncomfortable." *Id.* at 909. Plaintiff testified that she does not drive because she cannot turn her neck and that she only socializes "a little bit." *Id.* at 909-10. Scordino further indicated that her left hand is always numb and is "almost dead" and that her right hand was starting to feel the same way. *Id.* at 910. Additionally, she noted that her rheumatologist had diagnosed her with fibromyalgia, and that her blood work had "alarmed" her doctors because she had tested positive for lupus. *Id.* at 912-13. Finally, when asked about Dr. Silver's notes indicating that she was "doing great" after her surgery, Plaintiff indicated that she had "[n]ever" felt great. *Id.* at 913.

Regarding her treatment, Scordino testified that she sees an orthopedic doctor at Island Musculoskeletal Care, who gives her epidurals every three months as well as pressure point injections and refers her to physical therapy and that in addition, she sees two pain management doctors. *See id.* at 904-05. Plaintiff also testified that she is taking 300 milligrams of Gabapentin four times a day and Flexeril twice a day and that the medication makes her "very sleepy," "sometimes dizzy" and "a little lethargic[]," and she is not "supposed to drive or . . . use machinery" while on this medication. *Id.* at 904-05. Plaintiff explained that there would be "no way that [she] could function" at a full-time job as a result of the medications' side effects. *Id.* at 910. Finally, Plaintiff indicated that her three doctors have recommended that she have another spine surgery and that she had an appointment with a surgeon scheduled for February 27, 2015.[15] *Id.* at 905.

---

[15] The record does not indicate that Scordino had this surgery.

29

ALJ Kilgannon summarized Scordino's testimony concerning her symptoms, noting that "she experiences pain over her cervical spine as well as her entire body. . . cannot sit too long nor can she stand too long." *Id.* at 23. ALJ Kilgannon then summarized Plaintiff's daily activities as follows:

> With regard to activities of daily living, the claimant testified that she cares for her 10-year-old son and sees him off to school daily. She explained that she passes the rest of her day watching television, napping and straightening up. With further specificity, the claimant explained that the heavier housework is completed by her fiancée [sic] with whom she lives. She testified that he dusts, and cleans, but that she will make a quick meal and can fold laundry.

*Id.* He concluded "[a]fter careful consideration of the evidence," that Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms[,]" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 27.

ALJ Kilgannon's credibility finding is deficient as a matter of law because he failed to follow the framework outlined above. *See Astrue*, 2009 WL 2168732, at *17 (remanding based on ALJ's failure to follow credibility framework). Although he summarized Plaintiff's testimony concerning her limitations and abilities, ALJ Kilgannon failed to evaluate her testimony and identify "which statements about the intensity and persistence of [her] symptoms are consistent with specifically identified evidence in the record," or explain which statements he determined are inconsistent with the medical evidence in the record and why he chose to discredit them. *See Box v. Colvin*, 3 F. Supp. 3d 27, 48 (E.D.N.Y. 2014) ("Courts have repeatedly rejected the use of a shorthand credibility determination[.]") (internal quotation marks, citation

and alteration omitted).  A further "serious flaw" in ALJ Kilgannon's analysis is his failure to consider the seven credibility factors set forth in 20 C.F.R. § 404.1529(c)(3). *See id.* (citation omitted).  Aside from a cursory reference to Plaintiff's daily activities, ALJ Kilgannon made no reference to Scordino's frequency and intensity of pain, effectiveness and side effects of medication, or her treatments and other methods of relieving pain.  ALJ Kilgannon's failures to set forth with specificity the reasons for his credibility findings and to consider the § 404.1529(c)(3) factors are grounds for remand.  *See id.* (directing ALJ to discuss the § 404.1529(c)(3) factors on remand); *Grosse v. Comm'r of Soc. Sec.*, No. 08-cv-4137, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding that ALJ "committed legal error" because he failed to consider any of the credibility determination factors except the claimant's daily activities); *Hardhardt v. Astrue*, No. 05-cv-2229, 2008 WL 2244995, at *11 (E.D.N.Y. May 29, 2008) (remanding where ALJ "failed to provide any analysis of Plaintiff's subjective complaints" and instead "summarily stated that he considered the factors described in the regulations for evaluating symptoms and proffered no specific reasons for his findings").

## C. <u>The Case Should Be Remanded for Further Administrative Proceedings</u>

Scordino requests a judgment on the pleadings, or alternatively, for the Court to remand the case for reconsideration of the evidence.  *See* Pl. Memo, 30.  Judgment on the pleadings is warranted "where the record contains 'persuasive proof of disability' and remand for further evidentiary proceedings would serve no further purpose."  *Donnelly v. Colvin*, No. 13-cv-7244, 2015 WL 1499227, at *15 (S.D.N.Y.

31

Mar. 31, 2015) (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998)).  Where, however, "there are gaps in the administrative record or the ALJ has applied an improper legal standard[,]" the court should order remand for further administrative proceedings.  *Id.*  (quoting *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999)).

On this record, the Court cannot conclude that "application of the correct legal standard could lead to but one conclusion[,]" because, as discussed above, there are inconsistencies between the medical opinions that ALJ Kilgannon reviewed.  *See Gonzalez v. Astrue*, No. 04-cv-3437, 2008 WL 755518, at *9 (E.D.N.Y. Mar. 20, 2008). Rather, ALJ Kilgannon's application of improper legal standards with respect to assessing the medical opinion of Plaintiff's treating physician and evaluating Scordino's credibility warrants further administrative proceeding.  *See Box*, 3 F. Supp. 3d at 49.  Accordingly, the Court respectfully recommends denying Plaintiff's motion insofar as she seeks a judgment on the pleadings and granting it with respect to her request to remand for further proceedings.

If, as here, the Court determines that remand is warranted, Scordino further requests that her case be heard by a new ALJ instead of by ALJ Kilgannon.  *See* Pl. Memo, 30.  Pursuant to the Social Security Regulations, an ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision."  20 C.F.R. § 404.940.  Generally, whether a case should be remanded to a different ALJ is a decision for the Commissioner to make.  *Sutherland*, 322 F. Supp. 2d at 292 (citations omitted).  However, courts have ordered the Commissioner to reassign a case to a new ALJ on remand where the

ALJ's conduct "gives rise to serious concerns about the fundamental fairness of the disability review process[.]"  *Id.*  In determining whether remand to a new ALJ is warranted, a district court should consider whether there exists:  "(1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; [or] (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party."  *Id.*  Circumstances justifying assignment to a new ALJ include where "the original ALJ had mischaracterized the record and had failed to consider the record with adequate care" and where the ALJ had demonstrated animosity towards the claimant's attorney and a "lack of sensitivity."  *Id.* (citing cases).  An ALJ's "[l]egal error alone is insufficient to support a finding of bias."  *Lebron v. Colvin*, No. 13-cv-9140, 2015 WL 1223868, at *24 (S.D.N.Y. Mar. 16, 2015) (citation omitted).

Here, Plaintiff does not argue, nor does the Court find, that ALJ Kilgannon will not comply with his obligations to impartially and completely develop the record on remand.  *See Nunez v. Barnhart*, No. 01-cv-5714, 2002 WL 31010291, at *4 (E.D.N.Y. Sept. 9, 2002) (leaving decision as to whether a new ALJ should be assigned "to the sound discretion of the Commissioner"); *cf. Sutherland*, 322 F. Supp. 2d at 293 (ordering remand to new ALJ where ALJ did not allow claimant's attorney to fully question medical expert at hearing and dismissed claimant's complaints with "apparent sarcasm"); *Lebron*, 2015 WL 1223868, at *24 (S.D.N.Y. Mar. 16, 2015)

33

(noting that ALJ's legal error of heavily relying on testimony of non-treating physician did not, by itself, give rise to concern, but when taken together with ALJ's conduct—namely, "unwarranted hostility" to claimant's counsel, including "block[ing] virtually *any* efforts" by claimant's counsel to cross-examine non-treating physician—justified assignment to a new ALJ) (emphasis in original).  Accordingly, the Court respectfully recommends that the decision as to whether a new ALJ should be assigned on remand be left to the discretion of the Commissioner.

## IV.  CONCLUSION

For the reasons set forth above, the Court respectfully recommends granting in part and denying in part Plaintiff's motion and remanding for further proceedings. The Court further recommends that the decision as to whether a new ALJ should be assigned on remand be left to the discretion of the Commissioner.

## V.  OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.  Any objections must be filed with the Clerk of the Court within 14 days of receipt of this decision.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:      Central Islip, New York
            November 19, 2019

                                    s/ Steven I. Locke
                                    STEVEN I. LOCKE
                                    United States Magistrate Judge